01-1901
ADM/AJB

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

---

No. 03-1609

---

| | | |
|---|---|---|
| Clayton Ristrom, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Asbestos Workers Local 34 Joint | * | |
| Apprentice Committee, also known as | * | |
| Twin Cities Area Asbestos Workers | * | |
| Local 34 Joint Apprenticeship | * | |
| Committee, | * | |
| | * | |
| Appellee. | * | |

---

Submitted: December 17, 2003
Filed: June 4, 2004

---

Before MORRIS SHEPPARD ARNOLD, HEANEY, and RILEY, Circuit Judges.

---

RILEY, Circuit Judge.

Clayton Ristrom (Ristrom) enrolled in a union apprenticeship program run by the Asbestos Workers Local 34 Joint Apprenticeship Committee (JAC). When the JAC cancelled Ristrom's participation in the apprenticeship program, Ristrom sued the JAC, claiming disability discrimination and retaliation in violation of the

SCANNED
AUG 09 2004
U.S. DISTRICT COURT MPLS

Americans with Disabilities Act (ADA). The district court[1] granted summary judgment in favor of the JAC, concluding Ristrom did not prove he has an ADA-qualifying disability and the JAC did not retaliate against Ristrom. We affirm.

## I. BACKGROUND

The JAC operates the Twin Cities Area Asbestos Workers Apprenticeship Program (Program), which offers participants an opportunity to perform on-the-job and classroom training to earn union journeyman status and higher wages. The JAC is comprised of four members, two representing management and two representing the union. The Program, typically completed in four years, requires participants to work full time during the week and attend classes on Saturdays from 8:00 a.m. to 2:30 p.m. from September though March. To complete the Program, participants must attend and pass all required courses.

On September 6, 1995, Ristrom, a high school graduate, entered the Program. By early 1996, Ristrom had already missed nearly three weeks of work, prompting his employer to discharge him. On February 22, 1996, Ristrom appeared before the JAC so the JAC could consider Ristrom's discharge from employment. The JAC reprimanded Ristrom for his absenteeism, cautioning him "that any additional non-compliance with the terms and conditions of the apprenticeship standards[] could result in disciplinary action." With the help of the union and the JAC, Ristrom secured employment. Ristrom thereafter successfully completed the first and second years of the Program, and advanced to the Program's third year in the fall of 1997.

On January 29, 1998, Ristrom's employer wrote to Ristrom confirming the employer told Ristrom his workmanship was "less than satisfactory and unacceptable," and "that as [a] 3rd year apprentice, you do not possess the minimum

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

skills of your class." The employer recommended Ristrom appear before the JAC so it could evaluate Ristrom's field and classroom performance. On February 10, 1998, Ristrom appeared before the JAC to respond to the report made by Ristrom's employer. The JAC agreed to defer action until the end of the classroom term.

According to Ristrom, he sought additional assistance from his instructor for his blueprint reading and pattern development courses, and his instructor "tried to help." Mark Morgan (Morgan), a JAC member, tutored Ristrom in pattern development at Morgan's home a few times between February and March 1998. At some point, Ristrom confided in Morgan that Ristrom had Attention Deficit Disorder (ADD), had marital problems, and took the prescription drug Zoloft for depression. Despite Morgan's tutoring, Ristrom failed some of his courses.

On April 14, 1998, Ristrom again appeared before the JAC to address his failing grades. The JAC voted to suspend Ristrom, postpone his advancement to the Program's final year, and make him re-take his third-year courses. Ristrom wrote a letter to the JAC contending its decision to make Ristrom repeat the third year of the Program was unfair. Ristrom contended his instructors and the JAC should have provided him tutoring or other assistance earlier to help him pass his courses, and that his father, a union member, had asked an instructor to tutor Ristrom. Ristrom also requested he be allowed "to correct any deficiencies that I have shown" before the September classes began. Ristrom's letter to the JAC did not mention ADD, depression, marital problems, or a learning disability. On April 16, 1998, the JAC notified Ristrom his advancement was postponed based on his "[f]ailure to attain a passing grade and pass the required examination for advancement."

When Ristrom began his third year for the second time, he again experienced difficulties with his blueprint reading course, ultimately passing seven of seventeen tests. However, before completing the course, Ristrom appeared before the JAC on November 10, 1998. Ristrom provided the JAC a letter informing it he was again

having difficulty with blueprinting, and that the local board told him his "overall score was below passing." Ristrom sought tutoring assistance, and asked to retake the tests he had failed so he could "bring [his] score up to a passing grade." Ristrom notified the JAC he was "still concerned with [his] ability to grasp the whole concept. . . . I do not have trouble doing the field work, just the classroom work. Because of the importance of this matter, I have made an appointment on November 18 for testing for a possible learning disability. I ask that you reserve judgment on my future until this testing is complete. This will take from four to six weeks. I am hoping this will resolve any problems I have had in the past. I want to move forward to the next level and successfully complete this program." Ristrom admits that, at the time of the meeting, he did not know whether he had a learning disability. The JAC agreed to defer taking action against Ristrom at that time.

In a letter "To Whom This May Concern" dated December 30, 1998, Dr. Armantina Espinosa (Dr. Espinosa), a pediatric neurologist, wrote that Ristrom's neurology consultation for concentration and memory difficulties was normal. Dr. Espinosa wrote that Dr. Charlaine Skeel (Dr. Skeel) performed a psychological evaluation of Ristrom to evaluate his learning abilities, memory and attention skills. This evaluation revealed Ristrom's verbal performance and IQ were "within the low average range." Dr. Skeel also reported that "tasks sensitive to inattention or concentration difficulties do not indicate noteworthy deficits," and that the "TOVA test results were negative for inattention." Finally, Dr. Skeel's evaluation showed her screening for immediate and short-term memory deficiency was negative. Dr. Espinosa noted her "[d]iagnostic impressions included dysthymia," a type of depression. Finally, Dr. Espinosa wrote that specific support for Ristrom "in order to sit for a required exam in his field of work may include tutoring, with time allowed for repetition of learned skills within a structured study situation."

This was not the first time Ristrom sought an evaluation regarding possible ADD. In April 1994, Ristrom referred himself for a psychological evaluation,

because he had concerns he had ADD. At that time, Ristrom was "beginning school to be trained as a sales representative and [was] concerned about his inability to concentrate and complete required course work." Dr. Kristina Lund (Dr. Lund), a licensed psychologist, conducted a psychological evaluation to address Ristrom's concerns. Dr. Lund stated Ristrom's "academic or cognitive skills do not seem to be highly developed but [there] does not seem to be strong evidence of a learning disability." Concluding Ristrom is not "suffering from Attention Deficit Disorder at this time," Dr. Lund recommended that Ristrom consult with a psychiatrist to possibly medicate his depression and anxiety, and seek counseling or therapy. Dr. Lund noted that, if those two recommendations failed, "the possibility of Attention Deficit Disorder could be reconsidered." Finally, Dr. Lund cautioned that, if Ristrom "chooses a profession or career which requires the use of mathematical computation or academic skills[,] he will probably need remedial help until the necessary processes become somewhat automatic for him." Ristrom never provided this 1994 evaluation to the JAC.[2]

Ristrom did not immediately provide the results of his November 1998 evaluation to the JAC. When the semester began in January 1999, Ristrom immediately began missing class, and missed five of the first six classes in 1999. After Ristrom missed the first class of the semester on January 9, the JAC asked Ristrom to appear before it. Ristrom appeared before the JAC on January 19, and

---

[2]In reaching this overall conclusion, Dr. Lund noted Ristrom's IQ tests placed him "in the low-average range of cognitive functioning." Ristrom's scores on the Connors Continuous Performance Test "were not consistent with a diagnosis of Attention Deficit as he was able to respond consistently and appropriately. There were no indications of impulsivity or loss of attention, either in short or long term ratings on the test." Dr. Lund noted that Ristrom "is experiencing feelings of depression, anxiety and possible relationship difficulties in his family. This evaluation would suggest that [Ristrom's] psychological symptoms, his depression, anxiety and possible underlying anger or hostility are quite intense and that these may indeed be the cause of his difficulties in concentrating."

informed it of the psychological evaluation and asked the JAC for tutoring help. Ristrom claims the JAC refused to assist him with tutoring, telling him he was on his own to find tutoring help. The JAC contends it tried to assist Ristrom, but he failed to avail himself of its assistance. Ristrom submitted a note dated January 14, 1999, from Dr. Eric Berg (Dr. Berg), which stated Ristrom "lost time" because of "Dr's Appointments." The note also stated "Ristrom has been seen by neurologists and is being treated for depression with Zoloft."

On January 20, the JAC wrote Ristrom a letter informing him his suspension continued and that he was required to successfully complete all of his third-year classroom training by March 27, 1999, or he would be cancelled from the Program. Ristrom then missed the next two classes on January 23 and 30. On February 3, the JAC asked Ristrom to appear before it on February 9. Ristrom missed class again on February 6. Ristrom appeared before the JAC on February 9, asking it to allow him to withdraw or take a leave of absence from the Program rather than be cancelled. Ristrom claims he gave the JAC a note from Dr. Berg, dated February 9, stating Ristrom was absent from January 9 to February 9, 1999, for "dysthymia, possible depression," stating "no attendance until further evaluation–Rx Zoloft," and noting "work-up in progress–mental health referral to be done." The JAC unanimously voted to cancel Ristrom's participation in the Program "on February 12th, 1999, for failure to meet the terms and conditions of his suspension agreement."

After the February 9 JAC meeting, Ristrom saw Dr. W. David Bailey (Dr. Bailey), a licensed psychologist. In a letter "To whom it may concern" dated March 22, 1999, Dr. Bailey stated Ristrom "has provided history and test results congruent with a preliminary Diagnosis of attention deficit disorder and depression. It is also likely that he is alcoholic." Dr. Bailey noted Ristrom "has chosen to abstain from alcohol and attend a self help group for alcoholism, accept a prescription for [Z]oloft (an antidepressant) and he is considering the use of a stimulant for his attention deficit. It is likely the changes in lifestyle, the willingness to refrain from drinking

and go on a regimen of prescription drugs will enhance his ability to work and learn effectively. Because his performance, persistence, attention, and memory capacity are likely to improve, it would be advisable to reconsider his ability to perform work and learning tasks after 3 to 6 months of treatment." Ristrom provided no additional medical evidence.

Ristrom sued the JAC, alleging disability discrimination and retaliation in violation of the ADA. The district court granted summary judgment to the JAC, concluding Ristrom (1) failed to show he has an ADA-qualifying disability, and (2) failed to produce "evidence of causation between his requests for assistance and his cancellation from the Program, which occurred many months later and after various incidents allowing for cancellation under the Agreement [Ristrom] signed."

## II. DISCUSSION

We review de novo the district court's grant of summary judgment to the JAC. Mayer v. Nextel West Corp., 318 F.3d 803, 806 (8th Cir. 2003). Summary judgment is proper if the evidence, viewed in the light most favorable to Ristrom and giving him the benefit of all reasonable inferences, shows there are no genuine issues of material fact and the JAC is entitled to judgment as a matter of law. See id.; Fed. R. Civ. P. 56(c).

### A. Disability Discrimination

The ADA prohibits a covered entity from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." Id. § 12102(2). Ristrom contends he has satisfied all three definitional prongs.

To establish a discrimination claim under the ADA, Ristrom must show (1) he has an ADA-qualifying disability, (2) he is qualified to perform the essential functions of his position with or without a reasonable accommodation, and (3) the JAC took adverse action against him because of his disability. Epps v. City of Pine Lawn, 353 F.3d 588, 591 (8th Cir. 2003). The Supreme Court recently advised courts to interpret the ADA's terms "strictly to create a demanding standard for qualifying as disabled." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002). Because we conclude Ristrom has not met this demanding standard, we affirm the district court's grant of summary judgment to the JAC.

To survive summary judgment, Ristrom must prove he has an impairment that substantially limits a major life activity. Ristrom maintains his impairments are ADD and depression, and both impairments substantially limit the major life activity of learning. We do not quarrel with Ristrom's assertion of his impairments or that learning is a major life activity, but rather we focus on whether Ristrom has produced the necessary evidence to prove these impairments substantially limit his ability to learn.

"Substantially limits" means "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1); Toyota Motor, 534 U.S. at 195-96. According to the Supreme Court, "substantially" means "considerable" or "to a large degree." Toyota Motor, 534 U.S. at 196 (citation omitted). Thus, we ask whether Ristrom has produced evidence to prove his asserted impairments (i.e., ADD and depression) limit his ability to learn to a considerable or large degree as compared to the average person in the general population.

When addressing this question, we are reminded "Congress intended the existence of a disability to be determined in [] a case-by-case manner." Id. at 198. Furthermore, "[a]n individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person." Id. at 199. Thus, we begin our analysis with the clear understanding that ADD and depression do not qualify as disabilities per se under the ADA, but must satisfy the ADA's demanding standard in each individual case in the context of the major life activity asserted. We also have the firm understanding that an individual cannot prove disability status by "merely submit[ting] evidence of a medical diagnosis of an impairment." Id. at 198. Instead, the ADA requires individuals seeking the ADA's protection "to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial." Id. (quoting Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 567 (1999)).

Ristrom has failed to offer evidence–medical or otherwise–that proves his ADD or depression substantially limits his ability to learn to a considerable or large degree as compared to the average person in the general population. The district court recognized this lack of proof: "[Ristrom]'s conclusory pronouncement that he is substantially limited in the major life activity of learning because he found certain subjects or educational contexts challenging or frustrating is insufficient to withstand summary judgment on this issue." Ristrom graduated from high school, successfully completed the first two years of the Program, passed seven of seventeen tests in his blueprinting course (including some perfect scores), and held a full-time job. Ristrom could not successfully complete a few highly specialized courses in the third year of an advanced apprenticeship program, which bestows journeyman status on those who pass, entitling them to higher wages for their advanced skills. The record does not indicate how the average person in the general population would fare in the highly specialized courses Ristrom was taking.

Ristrom's self-referred medical evaluations also do not aid his claim that any ADD or depression substantially limits his ability to learn as compared to the average person in the general population. Ristrom's 1994 evaluation specifically concluded he does not have a learning disability or ADD. That evaluation in no way indicated Ristrom was unable to learn as compared to the average person in the general population. Indeed, his IQ test scores placed him "in the low average range of cognitive functioning." Ristrom's 1994 evaluation did note his depression, anxiety, anger, hostility and relationship problems could make concentrating difficult, but did not establish Ristrom has an impairment that substantially limits his ability to learn.

Ristrom's 1998 evaluation studied his learning abilities, concluding he did not have problems with attention deficit and placing his IQ "within the low average range." Ristrom's post-cancellation evaluation in 1999 simply stated the history and test results Ristrom provided were "congruent with a preliminary Diagnosis of [ADD] and depression." The evaluation also stated Ristrom is likely an alcoholic. Nowhere in Ristrom's 1999 evaluation does it discuss whether his impairments substantially limit his ability to learn, and the evaluation certainly does not compare Ristrom's learning ability to that of an average person. Ristrom's pre-cancellation and post-cancellation medical evidence do not prove he has an ADA-qualifying disability. See, e.g., Calef v. Gillette Co., 322 F.3d 75, 84 (1st Cir. 2003) (holding that plaintiff's medical testing evidence and life experience showed no substantial limitation on learning); Palotai v. Univ. of Md. at Coll. Park, No. 01-1147, 2002 WL 1379969, at *8-9 (4th Cir. June 27, 2002) (concluding the failure of the medical evidence to compare the plaintiff's ability to learn with the average person in the general population was fatal).

It can be a harsh reality for an individual to discover he is unable to accomplish that which he hoped to accomplish. Individuals possess varying levels of academic potential. Employees who fail to learn or learn at a slower pace do not automatically qualify for protection under the ADA. Instead, the ADA protects only those

individuals who present reliable evidence proving a physical or mental impairment that substantially limits their ability to learn as compared to an average person in the general population. The record does not contain evidence proving Ristrom is unable to learn to the same degree as the average person in the general population. The record also does not show which one of Ristrom's impairments causes him to miss class and fail a few courses. For example, the record is replete with references to Ristrom's lack of motivation, anger, alcoholism, depression, anxiety, marital problems and attention deficit issues. Although Ristrom maintains his ADD and depression substantially limit his ability to learn, he has failed to offer sufficient proof that these impairments, as opposed to his other life issues, cause him to miss class and fail certain tests.

Ristrom successfully completed over half of the highly specialized Program's requirements before he encountered difficulties with a few courses. The inability to pass a few highly specialized courses does not indicate an inability to learn under the ADA. In Leisen v. City of Shelbyville, 153 F.3d 805, 806, 808 (7th Cir. 1998), Lori Leisen, an individual with alleged "emotional disabilities," pursued her dream of becoming a paramedic and firefighter. After four failed attempts to pass courses to obtain the required paramedic license during her three-year probationary term, Leisen asked the city to accommodate her emotional disability by extending her probationary period so she could obtain her paramedic license. Id. at 806-07. When the city refused Leisen's request, Leisen sued the city for disability discrimination. Affirming summary judgment for the city, the Seventh Circuit held Leisen failed to prove her emotional disability or depression substantially limited the major life activity of learning. Id. at 808. In reaching this conclusion, the court made a prescient observation:

> The mere fact that Leisen was having obvious difficulty in passing the course for paramedic certification does not show that she was substantially limited in the major life activity of learning, any more

> than the fact that a particular individual might not be able to pass a course in physics or philosophy would allow an inference that all learning activity was substantially limited.

Id.; see also Summers v. Middleton & Reutlinger, P.S.C., 214 F. Supp. 2d 751, 756 (W.D. Ky. 2002) (holding the plaintiff's "alleged difficulty with learning defendant's computer system" does not show she is substantially limited in the major life activity of learning). The Seventh Circuit noted Leisen maintained her EMT certification and completed other training courses at the time she failed the paramedic course, which precluded a finding that her emotional disability substantially limited her ability to learn. Leisen, 153 F.3d at 808. Finally, the court alternatively held the city was not required to accommodate Leisen because she "tried and tried" to obtain her paramedic license, but was unable to do so after four attempts over a three-year period. The court decided the city was entitled to conclude Leisen would not likely pass the course even if given more time. Id.

Like Leisen, Ristrom has not shown he is unable to learn; he simply could not pass a few courses in the third year of an advanced apprenticeship program. This does not prove he has an ADA-qualifying disability. Human intellect, talents and industry simply are not uniform. Strive as we might, we cannot learn every skill in life. Inadequate performance in certain life endeavors does not necessarily reflect any disability in learning.

Another fatal flaw in Ristrom's claim is the JAC never knew Ristrom had a learning disability. To be liable for disability discrimination, the JAC would have had to cancel Ristrom's participation in the Program because of an ADA-qualifying learning disability. When Ristrom appeared before the JAC on February 9, 1999, he was the only person who believed he had a learning disability. Although Ristrom sought a learning disability diagnosis in 1994 and 1998, both medical evaluations concluded Ristrom did not have a learning disability. Taking action against an

individual who believes he has a disability is not the same thing as taking action against an individual who actually has a disability, unless Ristrom had a record of or was regarded as having a disability.

At the time the JAC cancelled Ristrom from the Program, Ristrom did not have a record of a physical or mental impairment that substantially limited his ability to learn. Ristrom strongly believed he had a learning disability and that the JAC knew about it. However, Ristrom did not present evidence to support his claim. Instead, the record shows even Ristrom and his doctors had no record of Ristrom having a learning disability. Thus, the JAC cannot be liable under the ADA for discriminating against Ristrom based on a record of disability. The ADA simply does not force the JAC to disregard Ristrom's medical evidence and rely on his self-diagnosis instead.

The JAC could regard Ristrom as disabled under the ADA by mistakenly believing he has a physical impairment that substantially limits a major life activity or by mistakenly believing Ristrom's actual, nonlimiting impairment substantially limits a major life activity. Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999). The record clearly paints a picture in which nobody regards Ristrom as having an ADA-qualifying learning disability. Before taking action against Ristrom, the most the JAC knew is that Ristrom perceived himself as having a learning disability, but no medical provider agreed with Ristrom's self-diagnosis. The JAC regarded Ristrom as being unable to attend his classes and pass certain tests in the Program. Nothing suggests the JAC believed Ristrom was substantially limited in his ability to learn.

Ristrom also contends the JAC violated the ADA by failing to accommodate his learning disability. The ADA requires the JAC to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). We have already

concluded the JAC did not know Ristrom had a learning disability, so the JAC had no duty to accommodate Ristrom's self-diagnosed learning disability.

Finally, we recognize Ristrom's use of medication, or plans to use medication, impacts his ADA claim as well. As early as 1994, Ristrom was informed he experienced depression and should possibly medicate his depression. In 1998, Ristrom's evaluation also diagnosed him with depression, and Ristrom told Morgan in 1998 that he took Zoloft for depression. On January 14, 1999, Dr. Berg noted Ristrom "is being treated for depression with Zoloft." Dr. Berg wrote in his February 1999 note that Ristrom was prescribed Zoloft for depression. Finally, Dr. Bailey's March 1999 note recorded a preliminary diagnosis of depression and Ristrom accepted a prescription for Zoloft. Although nothing indicates Ristrom's depression substantially limits his ability to learn (and nothing compares Ristrom's ability to learn with that of the average person in the general population), that is not the only focus when deciding whether Ristrom has an ADA-qualifying disability. The Supreme Court has held the ADA does not look at an individual's hypothetical unmedicated state, but rather looks at the effects of an individual's mitigating measures, which include medication, when deciding whether an individual's impairment substantially limits a major life activity. See Sutton, 527 U.S. at 482; Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 521 (1999). The record is devoid of evidence examining Ristrom's depression in his medicated state, just as it is devoid of evidence examining the impact Ristrom's depression has on his ability to learn.

### B. Retaliation

The ADA also prohibits retaliation against an individual for taking action protected by the ADA. 42 U.S.C. § 12203(a). Ristrom contends the JAC retaliated against him for seeking accommodations. To establish a retaliation claim under the ADA, Ristrom must show he engaged in protected activity, the JAC took adverse action against him, and a causal connection between the two. Cossette v. Minn. Power & Light, 188 F.3d 964, 972 (8th Cir. 1999). As recognized by the district

court, "there is a complete lack of evidence of causation between [Ristrom's] requests for assistance and his cancellation from the Program, which occurred many months later and after various incidents allowing for cancellation." We agree.

Ristrom began seeking assistance from the JAC in 1998, and his father sought assistance for him in 1997. The JAC did assist Ristrom, including finding him employment after his first employer discharged him for missing too much work, tutoring him through Morgan, and allowing Ristrom to retake his third-year courses. When Ristrom asked the JAC on November 10, 1998, to "reserve judgment on my future until [my testing for a learning disability] is completed," the JAC reserved judgment. By February 1999, the JAC apparently had enough with Ristrom's failure to attend classes and his inability to verify medically a learning disability. At that point, the JAC cancelled Ristrom from the Program. The ADA's anti-retaliation provision does not clothe Ristrom with immunity for past and present unsatisfactory performance. See Jackson v. St. Joseph State Hosp., 840 F.2d 1387, 1391 (8th Cir. 1988) (Title VII). The record does not support Ristrom's retaliation claim.

## III. CONCLUSION

For the reasons discussed, we affirm the district court's grant of summary judgment in the JAC's favor.

HEANEY, Circuit Judge, concurring.

I concur in the result the majority reaches, but write separately to advance an alternative reason for affirming the district court's dismissal of Clayton Ristrom's discrimination claim. I believe Ristrom's repeated absences from the training program and his apprenticeship jobs, in addition to his failing grades, were a legitimate, nondiscriminatory basis for his termination from the apprenticeship program. See Price v. S-B Power Tool, 75 F.3d 362, 365-66 (8th Cir. 1996) (finding violation of the employer's attendance policy as a valid, nondiscriminatory, reason

for firing the plaintiff). It is on this ground that I would affirm the district court's grant of summary judgment in favor of the Joint Apprenticeship Committee (JAC). Anderson v. Larson, 327 F.3d 762, 767 (8th Cir. 2003) (stating that a district court's grant of summary judgment can be affirmed by relying on any justification that the record supports).

I view the record regarding Ristrom's learning disability differently than the majority. The majority emphasizes Ristrom's completion of the first two years of the program, in addition to his high school graduation, as evidence that he was not substantially limited in his ability to learn. Ristrom could have mastered the two years of course work, however, and still suffered from a disability that prevented him from mastering later course work. His early success in the program should not in any way absolve the JAC – or any similarly situated employer – of its obligation to accommodate Ristrom once his learning disability became an obstacle, nor should his graduation from high school be viewed as an indication that Ristrom never suffered from a learning disability. Such accomplishments do not mean that the disability did not affect his life in a significant manner or greatly impact his capacity to learn. Toyota[3] does not stand for the broad proposition that one's life must come to a standstill in order to satisfy the ADA's definition of disability.

In his affidavit, Ristrom attests to the many difficulties he had in school: flunking first grade, being placed in special education classes, and having to receive special tutoring in his math classes. In the school setting, where he was supported, he was able to graduate; that does not mean, however, that he was not learning disabled. In fact, when viewed in the light most favorable to him, Ristrom's affidavit shows evidence of a learning disability beginning at a young age, requiring accommodation in order for him to function in an academic setting similar to that of the training program. See Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 509-10

---

[3]Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002).

(7th Cir. 1998) (finding that the plaintiff successfully raised an issue of fact as to whether her experiences with Attention Deficit Disorder constituted a record of impairment when she had testified to her difficulties in school).

In this case, however, Ristrom regularly missed scheduled classes without a sufficient explanation that his disability was the cause of those absences. Ristrom has not proven that the JAC terminated him for any reason other than his absences and failing grades. For this reason, I concur in the result reached by the majority.

---

A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: Michael E. Gans